IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
May 13, 2003 Session

## STATE OF TENNESSEE v. ROBERT KERN HOLLOWAY

**Direct Appeal from the Circuit Court for Dickson County**
**No. CR5515     Allen Wallace, Judge**

---

**No. M2002-01904-CCA-R3-CD - Filed September 17, 2003**

---

A Dickson County jury convicted the defendant, Robert Kern Holloway, of second degree murder, a Class A felony, and he was sentenced to forty years to be served at 100% as a violent offender. On appeal, he argues:  the evidence was insufficient to support his conviction; the trial court improperly instructed the jury regarding the mens rea element of second degree murder; and the trial court abused its discretion in ruling on his *pro se* motion for a new trial which alleged ineffective assistance of counsel.  Upon review, we affirm the judgment of the trial court as to the defendant's conviction but vacate its ruling as to the *pro se* ineffective assistance of counsel claim.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in Part, Vacated in Part**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOSEPH M. TIPTON and DAVID H. WELLES, JJ., joined.

Michael J. Flanagan, Nashville, Tennessee, for the appellant, Robert Kern Holloway.

Paul G. Summers, Attorney General and Reporter; Christine M. Lapps, Assistant Attorney General; Dan M. Alsobrooks, District Attorney General; and Suzanne Lockert, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

**Trial**

On March 13, 2001, a fight broke out between two inmates in the "B-Pod" at the Dickson County Jail, in which the defendant, also known as "Chow Hound," stabbed the victim, Mark Hall, multiple times with a "shank," or homemade knife.  After the victim collapsed, the defendant called prison officials over the intercom.  When prison officials arrived, the victim had a faint pulse and

was transported to the Horizon Medical Center emergency room where he later died as a result of multiple stab wounds.

At trial, several of the inmates who were present in B-Pod on the day of the altercation testified to the events leading up to the victim's death. That morning, prison officials were upset with the inmates in B-Pod because they refused to clean up. After several requests that the inmates clean their pod, prison officials turned off the power, denying the inmates television and phone access. After the power was turned off, the victim approached the defendant and asked to use the defendant's shank, apparently to get to another source of electricity to attach a wire to heat his coffee or to try and make a television set operable. The defendant refused and told the victim to "go on and leave me alone," or "I want it to be over," to which the victim replied, "[I]t's not over" or "[I]t's not over with by a long shot."

The victim then proceeded toward his bunk in another section of the pod and went to the door of the pod to receive his medications from the prison nurse. Shortly after the victim returned to his bunk, the defendant approached and stabbed him with a shank. The victim was unarmed.

Several of the inmates testified that, after the initial stabbing, they heard the victim say "put the shank down, fight like a man." The defendant did not put the shank down and proceeded to follow the victim around several areas of the pod. Each time the victim stopped, the defendant stabbed him a few more times. At some point during the altercation, the victim attempted to pick up a milk crate and swing it at the defendant. Finally, the victim collapsed near the stairs and the defendant called for prison officials.

Deputy Tracy Gage and Nurse Wendy Smith, who had just administered medications to the inmates in B-Pod prior to the altercation, both testified that the defendant did not inform them that he was having a problem with the victim. They also said that, while they were administering medications to the inmates in C-Pod, they heard the inmates in B-Pod kicking the door and screaming. Gage then radioed for assistance.

Captain John Patterson testified that he and Lieutenant Bruce responded to Deputy Gage's call. Upon entering B-Pod, Patterson noticed the victim, who appeared to have been stabbed, lying under the stairwell. Patterson said the victim had a "very faint pulse," and he moved the victim in order to administer CPR. He accompanied the victim to the hospital, where the victim later died. Patterson identified a videotape of the area where the attack occurred and explained in detail what was shown on the tape as it related to the incident.

Patterson also testified that it was prison policy to separate inmates who were having problems. The separation of inmates occurs immediately if an inmate notifies prison officials, orally or in writing, of a problem he is having with another inmate and separation is automatic for fighting. Patterson also stated that he had not received any complaints from the defendant regarding the victim before or on the day of the incident.

Detective B. J. Gafford of the Dickson County Sheriff's Department was called to the jail to investigate the events that transpired on March 13, 2001. Gafford testified that a search of the shower area in the B-Pod uncovered a weapon, which he described as "a piece of plastic or maybe plastic and tissue on the handle and sharpened on the end." He also observed two small holes in the shower curtain and found two other shanks in a vent above a urinal in the shower area.

Buddy Tidwell, an investigator with the district attorney general's office, was also called to the scene to investigate. Tidwell testified that while he was searching the G-Pod, the defendant told him to check the mop buckets. Tidwell discovered that two of the mop buckets had removable metal handles. A yellow mop bucket with a missing handle was found in a janitorial closet "right off the common area outside of 'B' pod." He compared the handle of one of the buckets to the shank found in the shower and explained its resemblance to the shank:

> It's unique in size. It's about, maybe, a quarter inch or 3/8th of an inch in diameter. It's got a particular sort of farrow on the end of it that's peculiar to this mop bucket handle; and it appears to have some sort of black paint or enamel and at various places portions of the paint are chipped or missing; and this description matches the description of that shank exactly.

Offie Johnny Dotson, an inmate housed in the B-Pod of the Dickson County Jail, testified that the defendant and the victim, who was "highly tempered," had been arguing and the defendant told the victim, "[Y]ou want to take something, take this." He also said that the defendant "had killing in his eyes." Dotson recounted a prior conversation that he and the defendant had, in which the defendant stated "he was fixing to take somebody out. That he didn't want to be back on the street. He wanted to spend the rest of his life in the penitentiary . . . ." Dotson also recalled telling defense counsel, prior to trial, that the victim was the aggressor.

Daniel Stindt, an inmate at the Dickson County Jail, also testified to the events in question and said that he originally thought that the dispute was over food, but he later learned that it was over a shank. Stindt recalled the defendant telling him that he had gotten the shank off a mop bucket. Stindt heard the defendant tell the victim, "Do you want to take my shit? Do you want to steal my shit? Do you want to take this? Well, take this," after which the defendant stabbed the victim. Stindt testified that the defendant had a "look of evil" during the altercation. He also saw the defendant walking toward the shower area after the fight.

Chris Hollis, an inmate at the Dickson County Jail who was bunking with the victim on the day of the murder, testified that he heard the defendant tell the victim, "[H]ere's your shank now," prior to stabbing the victim.

Detective Andy Davis of the Dickson County Sheriff's Department testified that he was called to the crime scene to locate any blood and diagram the crime scene. His diagram, showing the location of the blood droplets in the pod, was made an exhibit to his testimony.

Dr. Charles Harlan, a forensic pathologist, testified that he performed the autopsy on the victim. He said that the victim had been stabbed at least eight times in the front and at least seven times in the back, grouping three of the back wounds together. The wounds ranged from one to five inches deep. One of the stab wounds pierced the victim's lung and another pierced his aorta causing severe internal bleeding. The immediate cause of death was loss of blood caused by multiple stab wounds. Dr. Harlan also testified that the victim's blood tested negative for the presence of drugs or alcohol.

The defendant then put on his case in chief. First, he called Earnest Pleasant, an inmate in the B-Pod of the Dickson County Jail, who testified that the victim approached the defendant several times and asked to borrow his shank. Each time the defendant refused these requests. Pleasant admitted that, on the day of the altercation, he told one of the detectives that he had not seen anything. Pleasant said that, prior this altercation, he had witnessed the victim fight two other people while in jail.

Next, the defendant testified. He said that prior to the fight, the victim asked him for his shank on three separate occasions and the defendant refused. Then, the victim left the defendant's area of the pod and proceeded to his bunk. He stated that the victim was unarmed. Testifying that he was acting in self-defense, the defendant recounted the incident:

> And then I looked over and I saw [the victim] standing there and whisper [sic] to [another inmate]. So at that point I thought that he was, you know, he had given me a mean look, you know; and I thought at that point he was discussing what he was going to do to me. . . .
>
> So I just sort of lost it at that point; and ran over to him; and – because this has been an ongoing process. He'd been bothering me for quite awhile trying to pick a fight; and stabbed him a couple of times.
>
> Well, then he runs [to another section of the pod]. Now I ran out behind him, okay, not stabbing him. I ran out behind him; and the reason I ran out behind him is because I had stabbed him, that's true; but I ran out behind him in order – because I didn't know what he was going to do. I didn't know if he was going to go seek a weapon and retaliate or what, so at that point I stopped. He stopped and I stopped.
>
> When I stopped, I stopped probably four to five feet from him – when I stopped, he came towards me; and when he came towards me, he had that look in his eyes; and he started talking about, put the shank down, come on let's fight, put the shank down; and he comes

4

towards me.  I'm still standing there at that point.  I'm not making any effort to proceed forward.  He's coming towards me.

. . . .

I wasn't getting along with him to begin with, so why am I going to loan him the shank to stick me with, so then I stabbed him a couple more time [sic].  So he comes around right through here [another section of the pod]; and once again he stops and I stop.  Then he came towards me and grabbed my shirt, you know; and when he grabbed my shirt, he ripped my shirt; and I stuck him a couple more times, you know.

So then he runs over here where the milk crates were that they kept ice in; and I followed, not stabbing him, you know, I followed; and then he grabs the milk crate and comes at me with the milk crate and swings the milk crate; and I blocked the milk crate with my hand, you know; and stuck him a couple more times, you know; and the whole time he's hollering, put the shank down, you know, come on lets fight, put the shank down.  But I stopped and he's not making any attempt to avail himself of the situation.  He's still proceeding on the attack, you know.

So anyway, he runs over here [another section of the pod], you know, and I followed over there, you know, and I can't remember at that point if I stuck him or not to be honest with you, you know; but then he runs over here and when he runs over here, [another section of the pod], he's under the steps.  Well, there's a table right there and I stop probably about right in here somewhere, if I remember correctly; and then he drops; and when he dropped, you know, I run over and hit the button to try to get him some help, you know.

The defendant also testified that he brought the shank to his pod from H-Pod and made the handle out of plastic "probably three or four nights prior to [the altercation]."  He said that he hid the shank behind a milk crate within his reach and retrieved it after he and the victim had their argument.

**Motion for New Trial Hearing**

At the hearing on his motion for a new trial, the defendant persisted on arguing the claims set out in his *pro se* motion for new trial, that trial counsel had been ineffective, asking the court to "rule on it."  The defendant also asked the court to appoint him new counsel to advise him regarding whether he should raise the post-conviction issues at the motion for a new trial, a request which the

trial court denied. Defense counsel asked the court to refrain from ruling on the defendant's *pro se* complaints that trial counsel was ineffective, while the defendant argued at length that the trial court should rule on the claims. Although the trial court explained, in brief, the danger in making an ineffective assistance of counsel claim in a motion for new trial, the defendant persisted, explaining his rationale:

> Well, according to Kendricks versus the State, Your Honor, the way I read this, is moreover we have previously warned defendants and their counsel of the dangers of raising the issue of ineffective assistance of trial counsel on direct appeal because of the significant amount of development and fact finding the issue entails.
>
> So what they're suggesting is, in my interpretation of that, is that the issues should be raised at the motion for new trial because it would be difficult to raise it later on.
>
> Now what you're saying is that if I raise it now and you rule on it now, I can't raise it later.

The defendant's trial counsel, representing him at the hearing on the motion for new trial, asked that the trial court not rule on the *pro se* request without first appointing additional counsel for the defendant. Acceding to the defendant's insisting that he wanted the trial court to rule on his ineffective assistance of counsel claims, the court did so, ruling that counsel had not been ineffective.

## ANALYSIS

### I.    Sufficiency of the Evidence

The defendant argues that the evidence was insufficient to support his conviction for second degree murder because there was no proof that he "intended to kill the victim." He asserts that, at most, the proof showed he was acting in self-defense.

In considering this issue, we apply the familiar rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979); see also State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992); Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge,

accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The defendant was convicted of second degree murder which is defined as "[a] knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1) (1997). The testimony of all of the witnesses to the altercation, including the defendant, was that the victim asked the defendant to use his shank, and the defendant refused. The victim then went to another area of the pod. Thereafter, the defendant, by his own testimony, went to find the unarmed victim and "stabbed him a couple of times." Further, the testimony of all the witnesses, including the defendant, was that after the initial stabbing, the victim attempted to run away and the defendant followed him. Each time the victim stopped, the defendant stabbed him a few more times. This process repeated itself until the victim finally collapsed. Additionally, Dr. Harlan testified that the victim died as a result of the multiple stab wounds. These wounds were one to five inches deep and three of them pierced the victim's left lung, right lung, and aorta.

Based on the evidence, a reasonable jury could have concluded from the victim's multiple stab wounds, facilitated by the defendant's following the victim after each subsequent stabbing, that the defendant was not acting in self-defense but, instead, intended to kill the victim. Accordingly, we conclude that the evidence readily supports the defendant's conviction for second degree murder.

## II. Jury Instruction

The defendant argued in his motion for new trial and on appeal that the trial court erred in instructing the jury regarding the definitions of the "knowing" mental state as it pertains to second degree murder, and that this error was not harmless because it "lessen[ed] the State's burden of proof."

7

To prove second degree murder, the State was required to show that the defendant "knowingly" killed the victim. As to "knowingly," the trial court instructed the jury by reading Tennessee Code Annotated section 39-11-106(a)(20):

> "Knowingly" means that a person acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

To assess this issue, we will review the opinion of this court in State v. Page, 81 S.W.3d 781 (Tenn. Crim. App. 2002), in which the defendant made similar claims as to the trial court's instruction as to "knowingly." The juvenile defendant in Page was tried as an adult and convicted of second degree murder for causing the death of the victim by striking him in the back of the head with a baseball bat. Id. at 782. At trial, Page admitted he had swung the bat at the victim, but claimed he did it only to intimidate him, had not intended to hit him in the head, and could not believe that he had died. Id. at 785. Defense counsel conceded that the defendant had hit the victim in the head, but argued that the defendant had been intoxicated, was unable to appreciate his conduct, and had "'no understanding of how wrong it was . . . how severe it was at that time.'" Id. In Page, the trial court instructed the jury as to "knowingly" by presenting three options: "(1) that his conduct is of a particular nature; or (2) that a particular circumstance exists; or (3) that the conduct was reasonably certain to cause the result." Id. at 786 (emphasis in original). On appeal, the defendant argued, as in the present case, that the trial court lessened the State's burden of proof by instructing the jury that the knowing element of second degree murder could be established not only by the defendant's awareness that his conduct was reasonably certain to cause the result, but also by the defendant's awareness that his conduct was of a particular nature or that a particular circumstance existed. Id. at 786. We agreed and remanded the case for a new trial for the jury to be instructed that the knowing mens rea of second degree murder requires that the defendant have acted with an awareness that his actions were reasonably certain to cause the death of the alleged victim. Id. at 790.

Likewise, in State v. Keith T. Dupree, No. W1999-01019-CCA-R3-CD, 2001 WL 91794, at *3 (Tenn. Crim. App. Jan. 30, 2001), the trial court had instructed as to "knowingly" utilizing the pattern jury instruction then in effect, which provided that it was established if the person was aware "either: (1) that his conduct is of a particular nature; or (2) that a particular circumstance exists." The instructions omitted the part of the "knowingly" definition providing that "[a] person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." See Tenn. Code Ann. § 39-11-106(a)(20). The court in Dupree explained why the instructional error was not harmless:

> We are unable to find harmless error. The sole issue in this case was whether the killing was knowing or accidental. In other

8

words, the sole issue was whether the defendant was aware that his conduct was reasonably certain to cause the result. Yet, this element was not conveyed to the jury, and a lesser standard was set forth.

2001 WL 91794, at *4.

A further consideration in the court's determination in Dupree that the error in instruction was not harmless was the fact that the jury had asked the trial court the question, "According to the law, does pointing a gun at someone else assume that the person pointing the gun 'knows' that the gun will hurt the other person?" Id. at *5.

In State v. Tony Martin, No. W2001-02221-CCA-R3-CD, 2003 WL 261937, at *8 (Tenn. Crim. App. Feb. 7, 2003), perm. to appeal denied (Tenn. June 30, 2003), the trial court gave instructions identical to those in the present appeal. The majority determined that the instructional error was harmless because, had the trial court given the proper instruction, the jury, considering the evidence, would not have reached a contrary result. Id. at *9. There, like here, the defendant claimed self-defense. Id. The Martin court reasoned:

> The primary dispute in this trial was whether the defendant fired his gun at the victim first or was fired upon first, prompting him to wield his gun in self-defense. It is undisputed that the defendant had a handgun, pulled it out, and that the gun was fired and caused the death of the victim. It belies common sense to believe that, if the defendant did indeed fire his gun first at close range, he was not aware that his conduct was reasonably certain to result in the death of the victim.

Id.

Here, the facts show that the defendant and the victim were involved in an argument. At no time during this argument or the subsequent altercation was the victim armed. The defendant testified that the victim left after the argument. Thereafter, the defendant located the victim and "stabbed him a couple of times" with a shank that was one-fourth to three-eighths of an inch in diameter and long enough to penetrate the victim's body five inches. The victim fled the area and went to another section of the pod. The defendant followed and, when the victim stopped, "stuck him a couple more times"; this process repeated itself until the victim finally collapsed. The defendant stabbed the victim multiple times, piercing the victim's right lung, left lung, and aorta.

Given the brutality and thoroughness of this attack, we conclude, as did the court in Martin, that the instructional error as to the definition of "knowingly" was harmless, it being clear to the defendant that his conduct was reasonably certain to result in the victim's death. Additionally, we note that the trial court instructed the jury on the lesser-included offenses of criminally negligent

9

homicide and voluntary manslaughter and also included a self-defense instruction. By its verdict, the jury rejected the defendant's version of the events. This issue is without merit.

### III. Ineffective Assistance of Counsel Claim at Hearing on Motion for New Trial

At the hearing on the motion for new trial, the defendant sought to argue his *pro se* claims of ineffective assistance of counsel, despite his counsel's requests that the court not rule on the claims. The defendant asserted that trial counsel was ineffective because he failed to (1) introduce evidence that the victim was a drug user; (2) impeach the credibility of the State's witnesses, specifically Dr. Charles W. Harlan who, according to the defendant, was under investigation for "botched autopsy reports and other related ethical practices"; (3) interview and present witnesses who could testify as to the tensions between the defendant "and friends of another inmate and his family members," which was relevant, in the defendant's view, to the issue of weapons being in the jail; and (4) introduce character evidence of the victim and the defendant. The defendant also claimed that his attorney was ineffective because he advised the defendant not to raise his ineffective assistance of counsel claims during the hearing on the motion for a new trial.

As this court has noted on a number of occasions, "the practice of raising ineffective assistance of counsel claims on direct appeal is 'fraught with peril' since it 'is virtually impossible to demonstrate prejudice as required' without an evidentiary hearing." State v. Blackmon, 78 S.W.3d 322, 328 (Tenn. Crim. App. 2001), perm. to appeal denied (Tenn. 2003). In fact, the defendant complains that the trial court did not afford him a fair evidentiary hearing as he pressed his *pro se* ineffective assistance of counsel claims during the hearing on the motion for new trial. We agree that there was not an evidentiary hearing as to the claims of ineffective assistance of counsel; and the procedure insisted upon by the defendant illustrates precisely the problems in ignoring the Post-Conviction Procedure Act, see Tenn. Code Ann. §§ 40-30-201 to -310, and particularly section 40-30-210 providing for an evidentiary hearing on post-conviction claims. We do not believe that the defendant's efforts should result in his relinquishing his right to file, at the appropriate time, a post-conviction petition. Accordingly, we vacate the ruling of the trial court as to the defendant's claim that trial counsel was ineffective and direct that this ruling does not bar his filing a post-conviction petition in accord with the Post-Conviction Procedure Act.

### CONCLUSION

Based upon the foregoing authorities and reasoning, we affirm the judgment of the trial court as to the defendant's conviction for second degree murder. We vacate the ruling finding that the defendant did not receive ineffective assistance of counsel at trial and allow the defendant to present this claim at a subsequent proceeding should he wish.

_____
ALAN E. GLENN, JUDGE

10